*968 TEXTO COMPLETO DE LA SENTENCIA
I
El Dr. Roberto Huertas (en adelante “Dr. Huertas”) solicita la revisión de una Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Arecibo (el TPI), el 30 de abril de 2002, archivada en autos copia de su notificación el 30 de mayo de 2002, en el caso de Roberto Huertas v. Junta de Directores del Hospital Dr. Susoni, Inc., y otros, Civil Número CPE 01-0405, sobre Entredicho Provisional Sumario, Injunction Preliminar e Injunction Permanente. Inconforme con el referido dictamen, el Dr. Huertas presentó Moción Solicitando Reconsideración y Moción Solicitando Determinaciones de Hechos Adicionales al Amparo de la Regla 43.3 de Procedimiento Civil, las cuales fueron declaradas No Ha Lugar mediante Resolución de 31 de julio de 2002, notificada y archivada en autos copia de su notificación el 2 de agosto de 2002.
Por su parte, los demandados-apelados, el Dr. José Arturo García Lloréns, en calidad de Presidente de la Junta de Directores del Hospital Dr. Susoni (HDS), Inc., y la Dra. Ada S. Miranda Lloréns, en calidad de Directora del Hospital Dr. Susoni, solicitaron la desestimación de la Solicitud de Apelación del Dr. Huertas por falta de jurisdicción. En Resolución de 26 de septiembre de 2002, concedimos término al Dr. Huertas para expresarse en tomo a la desestimación solicitada.
Así las cosas, el Dr. Huertas se opuso a la desestimación solicitada mediante su escrito en cumplimiento de orden, presentando posteriormente los apelados, duplica a la comparecencia del Dr. Huertas.
Transcurrido el término para los apelados presentar su alegato, resolvemos sin el beneficio de su comparecencia, no sin antes exponer el trasfondo fáctico y procesal acaecido.
II
El Dr. Huertas presentó Petición sobre Entredicho Provisional Sumario, Injunction Preliminar e Injunction Permanente, en o cerca del 11 de diciembre de 2001, contra: (1) la Junta de Directores del Hospital Dr. Susoni, Inc.; (2) Ada S. Miranda, Director Médico; y (3) el Dr. José Arturo García Lloréns, en calidad de Presidente de la Junta de Directores de HDS, Inc. (en adelante los “apelados”), solicitando del TPI ordenara a éstos abstenerse de impedir por sí o a través de sus empleados, agentes, mandatarios o persona alguna, que el Dr. Huertas pudiera atender en el Hospital Dr. Susoni a los pacientes que le requirieran sus servicios directamente o a través de otros facultativos médicos. Además, reclamó el pago de lucro cesante, daños y peijuicios, $10,000 en concepto de honorarios de abogado, así como las costas del litigio. Alegó, en esencia, que ejercía la práctica de anestesiología en el Hospital Dr. Susoni de Arecibo, de forma ininterrumpida desde el año 1996, en virtud de los privilegios médicos que le fueron concedidos por dicha institución, hasta el momento en que fue sumariamente privado de los mismos.
*969 Según se desprende de los documentos que fueron acompañados como Apéndice del recurso de apelación, la suspensión de los privilegios del Dr. Huertas obedeció a que los privilegios del Dr. Julio Rodríguez Gómez fueron suspendidos, por haber sido éste nombrado Director Regional del Departamento de Salud para la región de Arecibo, lo que le impedía a éste, Dr. Rodríguez Gómez, prestar servicios directos e indirectamente (mediante doctores que hubieran sido contratos por él) en el Hospital Susoni, siendo ese el caso del Dr. Huertas. Sin embargo, los apelados sostienen que los privilegios del Dr. Huertas no fueron suspendidos, sino que éstos siempre estuvieron condicionados a los arreglos contractuales existentes, por estar los servicios de anestesiología del Hospital Dr. Susoni contratados con la corporación Arecibo Respiratory Care, Inc., (en adelante “ARC’).
Para efectos de comprender mejor los argumentos de las partes, es menester señalar que ARC contrató con el Hospital Dr. Susoni la prestación de los servicios de anestesiología en la referida institución hospitalaria. Al contrato suscrito entre ARC y Hospital Susoni, se unió un Acuerdo Transaccional suscrito entre otros, por el Dr. Julio Rodríguez Gómez (denominado en el contrato como la Primera Parte); los Doctores Miguel y José Arturo García Lloréns (denominado en el contrato como la Segunda Parte); y la Corporación ARC (denominada en el contrato como la Tercera Parte), en virtud del cual, el Dr. Rodríguez Gómez y su esposa vendieron a los comparecientes de la segunda y tercera parte todas las acciones que poseían en la corporación ARC, y renunciaron a ocupar cualquier puesto de oficial o director en dicha corporación. A cambio, los comparecientes de la segunda y tercera parte garantizaron al Dr. Rodríguez Gómez que éste podría continuar brindando sus servicios profesionales de anestesia en el Hospital Susoni, mientras éstos (ARC) tuvieran el control de designar a las personas que en tales funciones se desempeñarían; y mientras él (Dr. Rodríguez Gómez) cumpliera con todas las reglas y reglamentos que se encontraren en vigor en el hospital.
Aclarado lo anterior, debemos señalar que informado el cese de los privilegios al Dr. Huertas, éste dirigió carta al Director Médico del Hospital Susoni, solicitando la reconsideración de la suspensión sumaria de sus privilegios. Sin embargo, como hemos indicado previamente, el Hospital negó que sus privilegios hubieran sido cancelados, sino que argumentó que éstos se encuentran sujetos a las relaciones contractuales existentes.
Así las cosas, presentada la petición de injunction preliminar y permanente, los apelados presentaron su Contestación a Petición, en o cerca del 22 de febrero de 2002. Posteriormente, el 4 de marzo de 2002, presentaron escrito intitulado Moción en Oposición a la Petición de Remedio Interdictal y en Solicitud de Sentencia Sumaria, alegando, en síntesis, que no procedía concederse al Dr. Huertas el injunction solicitado, toda vez que no cumplía con los requisitos exigidos para su concesión.
En virtud de ello, el TPI señaló la vista correspondiente para el 6 de marzo de 2002. No obstante, la vista no fue celebrada por acuerdo de las partes, ya que según informaron existía la posibilidad de estipular múltiples hechos y documentos a fin de limitar las controversias y/o colocar al TPI en posición de resolver sin la necesidad de que se celebrara una vista evidenciaría. Así las cosas, en o cerca del 19 de marzo de 2002, las partes sometieron Moción Conjunta en Tomo a Evidencia Documental y Hechos Estipulados por las Partes, estipulando los siguientes hechos:

“1. El doctor Roberto Huertas es médico anestesiólogo y ejerce su práctica de la anestesiología en la región de Arecibo.

2. El Hospital Dr. Susoni, Inc. es una corporación privada.

3. Desde el mes de julio de 1996 existe un contrato para la administración de anestesia en el Hospital Dr. Susoni entre Arecibo Respiratory Care, Inc. (“ARC”) y Hospital Dr. Susoni, Inc. Dicho contrato está vigente al día de hoy. 

*970 4. La cláusula XVI del “Employment Agreement” suscrito entre ARC y el Hospital Dr. Susoni, Inc., reconoce la existencia del acuerdo transaccional entre el doctor Rodríguez Gómez y ARC. -

5. Desde el 16 de agosto de 1995, por virtud de un Acuerdo Transaccional que puso fin a un litigio civil entre los accionistas de ARC y el doctor Rodríguez Gómez y su esposa, Amy Yolanda Matos, el doctor Julio Rodríguez Gómez administra anestesia en el Hospital Dr. Susoni, “mientras éstos (ARC) tengan el control de designar a las personas que en tales funciones se desempeñen; y mientras él (doctor Rodríguez Gómez) cumpla con todas las reglas y reglamentos que se encuentren en vigor en el hospital”.

6. El doctor Huertas no tiene relación contractual con ARC.

7. El 29 de agosto de 1996, la doctora Ada S. Miranda, en su carácter de Directora Médico Interina, suscribió una carta en la que le informó al doctor Roberto Huertas que se le concederían privilegios temporeros de Activo en el Departamento de Anestesiología en lo que la solicitud era evaluada,.más.le indicó. que “el departamento de anestesiología es uno contratado, por lo que sus privilegios estarán condicionados, a los arreglos establecidos por contrato”.

8. El 19 de noviembre de 1996, el doctor José Arturo García Lloréns, en su capacidad de presidente de la Junta de Directores del Hospital Dr. Susoni, Inc., suscribió una carta en la que informó al doctor Huertas que su solicitud sobre privilegios de médico Activo había sido aprobada.

9. El doctor Huertas nunca ha aspirado ni ha sostenido una posición directiva en el Hospital Dr. Susoni, Inc.

10. El doctor Huertas no recibe honorarios por parte del Hospital Dr. Susoni, Inc., ni ARC.

11. El 17 de octubre de 2001, el doctor Julio Rodríguez Gómez fue nombrado al puesto de Director Regional del Departamento de Salud para la Región Norte de Puerto Rico (“Director Regional”), la cual comprende el municipio de Arecibo. Al día de hoy sigue ocupando dicho puesto. 

12. A la fecha de su nombramiento como Director Regional, el doctor Julio Rodríguez Gómez tenía privilegios en el Hospital Dr. Susoni.

13. En carta fechada el 19 de octubre de 2001, mediante la cual se le informó al doctor Julio Rodríguez Gómez que sus privilegios médico hospitalarios en el Hospital Dr. Susoni de Arecibo quedaban suspendidos temporalmente durante la vigencia de su puesto como Director Regional, se le informó, además, al doctor Rodríguez Gómez que estaba impedido de igual forma de brindar servicios indirectamente a través de profesionales por él designados, por lo que se le suministró dicha misiva al doctor Roberto Huertas también. .

14. El 22 de octubre de 2001, al doctor Roberto Huertas se le concedieron privilegios de emergencia de manera que pudiera brindar servicios al doctor Julio Rodríguez Gómez para una intervención quirúrgica a este último.

15. El 1 de noviembre de 2001, la doctora Ada S. Miranda, en su carácter de Directora Médico Interina, suscribió una carta en la que le informó al doctor Roberto Huertas que sus privilegios son “condicionados a los arreglos establecidos por contrato, así como los acuerdos entre ARC y el Hospital. El mismo establece que es a través de esta corporación (incluyendo los acuerdos que éstos disponen con el doctor Julio Rodríguez Gómez) que se ofrecerán los servicios de anestesia en el hospital. De requerirse una excepción, tendría que ser autorizada por el director de anestesia”. La doctora Miranda también le indicó que dicha excepción debía ser autorizada por el Director del departamento correspondiente. ”

*971 Posteriormente, el 3 de abril de 2002, el Dr. Huertas presentó Réplica a Moción en Oposición a Petición y Solicitud de Sentencia Sumaria, lo que a su vez motivó que en o cerca del 9 de abril de 2002, los apelados presentaran Moción en Oposición a Réplica. Así las cosas, luego de evaluados los escritos de ambas partes, el TPI entendió innecesario la celebración de una vista evidenciaría, por lo que procedió a emitir la Sentencia que nos ocupa.
Inconforme, el Dr. Huertas acude ante nosotros alegando que el TPI incurrió en la comisión de los siguientes errores:

“1. Erró el Tribunal al declarar con lugar la Moción de Sentencia Sumaria presentada por la parte codemandada-apelada cuando en realidad existe controversia real y sustancial de los hechos y al dictar sentencia desestimando con perjuicio en todas sus partes la demanda presentada.

2. Erró el Tribunal al no reconocer que aunque no existe un contrato escrito entre el demandante apelante y Arecibo Respiratory Care, Inc. (ARC), sí existe un contrato sui generis entre el Hospital Dr. Susoni, Inc. (HDS), el Arecibo Respiratory Care, Inc., el Dr. Julio Rodríguez y el Dr. Roberto Huertas, apelante.

3. Erró el Tribunal al no determinar que la parte apelada utilizó el nombramiento del Dr. Julio Rodríguez como Director Regional del Departamento de Salud para la región Norte de Puerto Rico para enriquecerse injustamente a costa y en menoscabo de los derechos del apelante cobijándose en una unilateral e inaplicable interpretación de la Ley de Etica Gubernamental.

4. Erró el Honorable Tribunal de Instancia al adoptar como suyo un proyecto de sentencia el cual contiene hechos no estipulados, resulta contradictorio y no se sujeta al derecho aplicable. ”

III
Sabido es que la sentencia sumaria es un mecanismo procesal extraordinario y discrecional, que procede cuando la parte promovente le demuestra al tribunal que no existe necesidad de que se celebre una vista evidenciaría del caso en su fondo. Medina v. M.S. & D. Química P.R., Inc., 135 D.P.R. 716, 726 (1994). Solamente debe ser dictada “en casos claros, cuando el Tribunal tenga ante sí la verdad sobre todos los hechos pertinentes." Jusino Figueroa v. Walgreens of San Patricio, Inc., Op. de 1 de noviembre de 2001, 2001 J.T.S. 154, pág. 374; PFZ Properties, Inc. v. General Accident Insurance Co., 136 D.P.R. 881, 911-912 (1994); Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell, 117 D.P.R. 714, 720-721 (1986). Véase además, Rivera Báez v. Jaume Andújar, Op. de 28 de junio de 2002, 2002 J.T.S. 107, pág. 1526; Santiago Rivera v. Ríos Alonso, Op. de 7 de febrero de 2002, 2002 J.T.S. 21.
Su propósito es “propiciar la solución justa, rápida y económica de litigios que no presentan controversias genuinas de hechos materiales, y que por lo tanto no ameritan la celebración de un juicio en su fondo. ” Pilot Life Ins. Co. v. Crespo Martínez, 136 D.P.R. 624, 632 (1994); Hernández Villanueva v. Hernández, Op. de 27 de enero de 2000, 2000 J.T.S. 26, a la pág. 608. Además, se ha señalado que el fin de la sentencia sumaria es aligerar la tramitación de un caso, permitiendo que se dicte sentencia sin celebrar una vista en los méritos, cuando de documentos no controvertidos surge que no existen controversias de hechos, sino que lo que resta es aplicar el derecho. Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell, supra, a la pág. 720. Véase además, Jusino Figueroa v. Walgreens of San Patricio, supra, pág. 373; PFZ Properties, Inc. v. General Accident Insurance Co., supra; Caquías v. Asoc. Res. Mansiones Río Piedras, 134 D.P.R. 181 (1993). Es decir, que sólo debe concederse cuando el promovente ha establecido su derecho con claridad y ha demostrado que la otra parte no tiene derecho a recobrar bajo cualquier circunstancia que resulte discernible de las alegaciones y los documentos que obren en el expediente. Benítez Esquilín v. Johnson & Johnson, CPI, Op. Per Curiam de 30 de septiembre de 2002, 2002 J.T.S. 137, pág. 272.
*972 La Regla 36.3 de la Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 36.3, establece que se podrá dictar sentencia sumaria “si las alegaciones,... deposiciones-, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostrasen que no hay controversia real , sustancial en cuanto a ningún hecho natural y que como cuestión de derecho debe dictarse sentencia sumaria... Dicha sentencia podrá dictarse a favor o en contra de cualquier parte en el pleito. ” PFZ Properties, Inc. v. General Accident Insurance Co., supra, a la pág. 911; Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell, supra, a las págs. 719-720.
Como hemos indicado, este mecanismo procesal pretende obtener un remedio rápido y eficaz en casos en que queda demostrado que no existe una controversia sobre hechos materiales del litigio. Véase: Revlon Realistic, Inc. v. Las Américas Trust Company, 135 D.P.R. 363, 376 (1994); PFZ Properties, Inc. v. General Accident Insurance Co., supra, a la pág. 912; Rivera et. al. v. Superior Pkg., Inc. et. al., 132 D.P.R. 115, 133 (1992); Tello, Rivera v. Eastern Airlines, 119 D.P.R. 83, 86 (1987). Pero el objetivo de aligerar la tramitación de un caso no puede derrotar el principio fundamental de todo proceso ante un tribunal: alcanzar una solución justa. Cuadrado Lugo v. Santiago Rodríguez, 126 D.P.R. 272 (1990); Presiding Bishop C.J.C. of L.D.S. v. Purcell, supra. Así pues, “[e]n el sano ejercicio de su discreción, los tribunales no deben resolver sumariamente casos complejos o casos en los cuales están presentes cuestiones de interés público”. (Citas Omitidas) Rivera Rodríguez v. Departamento de Hacienda, Op. de 17 de septiembre de 1999, 99 J.T.S. 144, a la pág. 53.
Al dictar sentencia sumaria, el tribunal: (1) analizará los documentos que acompañan la moción solicitando la sentencia sumaria y los documentos incluidos con la moción en oposición y aquéllos que obran en el expediente del Tribunal...; (2) determinará si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. PFZ Properties, Inc. v. General Accident Insurance Co., supra, a la pág. 913. A diferencia de otras, tales como la moción de desestimación, la moción de sentencia sumaria no se considera a base de las alegaciones solamente, como regla general, sino basándose en declaraciones juradas y otros documentos admisibles como evidencia... En fin, es necesario demostrar afirmativamente que se cuenta con evidencia aceptable, admisible y suficiente para ser presentada en un juicio. Jusino Figueroa v. Walgreens of San Patricio, supra, pág. 373.
Un Tribunal no deberá dictar sentencia sumaria cuando: (1) existen hechos materiales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; o (4) como cuestión de derecho no procede, PFZ Properties, Inc. v. General Accident Insurance Co., supra, a la págs. 913-914; Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell, supra págs. 722-723; Cuadrado Lugo v. Santiago Rodríguez, supra, a la pág. 280. Además, “[hjay litigios y controversias que por su naturaleza no deben resolverse por sentencia sumaria, porque difícilmente en tales casos el Tribunal puede reunir ante sí toda la verdad de los hechos a través de documentos. Así ocurre en controversias... centradas en elementos subjetivos y en las que el factor de credibilidad juega un papel esencial, sino decisivo, para llegar a la verdad, y donde un litigante depende en gran parte de lo que extraiga del contrario en el curso de un juicio vivo”. (Citas Omitidas) Rivera Rodríguez v. Departamento de Hacienda, Op. de 17 de septiembre de 1999, supra, a la pág. 53.
Cuando el Tribunal de Instancia estime necesario celebrar juicio, determinará, al examinar la moción de sentencia sumaria, los hechos materiales sobre los cuales no hay controversia sustancial y los hechos materiales que está realmente y de buena fe controvertidos. En tal caso, “[ají celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad.” Si el tribunal declara sin lugar la moción de sentencia sumaria y no cumple con la obligación de especificar los hechos establecidos, todas las cuestiones planteadas en las alegaciones deberán ventilarse enjuicio plenario. Hartmann v. American News Co., 171 F. 2d. 581 (1948). Cuevas Segarra, Práctica Procesal Puertorriqueña: Procedimiento Civil, Publicaciones J.T.S., 1979, págs. 192-193. Así pues, tomando en consideración que la sentencia sumaria es un remedio de *973 carácter discrecional, “[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de su día en corte, principio elemental del debido proceso de ley”. Jusino Figueroa v. Walgreens of San Patricio, supra, pág. 374; Management Administration Services Corp. v. E.L.A., Op. de 29 de noviembre de 2000, 2000 J.T.S. 189, a la pág. 441; Roig Commercial Bank v. Rosario Cirino, 126 D.P.R. 613, 617 (1990). Véase además, Asociación de Pescadores de Punta Figueras, Inc. et al. v. Marina de Puerto del Rey, Inc., et al., Op. de 18 de diciembre de 2001, 2002 J.T.S. 4; García Rivera, et al. v. Enríquez Marín, et al., Op. de 2 de febrero de 2001, 2001 J.T.S. 15.
Los apelados fundamentaron, esencialmente, su solicitud de sentencia sumaria en que el Dr. Huertas no demostró los requisitos necesarios para la concesión del remedio interdictal solicitado, en particular al no establecer el daño irreparable y la inexistencia de un remedio adecuado en ley. Veamos.
Según lo establece el Código de Enjuiciamiento Civil, 32 L.P.R.A. Art. 675, § 3521, el injunction es un mandamiento judicial expedido por escrito, bajo el sello de un tribunal, por el que se requiere a una persona para que se abstenga de hacer, o de permitir que se haga por otras bajo su intervención, determinada cosa que infrinja o perjudique el derecho de otra. El injunction es, por su naturaleza, dinámico: “se caracteriza por su perentoriedad, por su acción dirigida a evitar un daño inminente o a restablecer el régimen de ley conculcado por conducta opresiva, ilegal o violenta del transgresor del orden jurídico ”. Noriega Rodríguez v. Hernández Colón, 130 D.P.R. 919, 932 (1992), citando a Peña v. Federación de Esgrima de P.R., 108 D.P.R. 147, 154 (1978). Por conceder un remedio que en el procedimiento usual ordinario no se alcanza hasta vencer en juicio, debe expedirse con sobriedad y sólo ante una demostración de clara e intensa violación de un derecho. A.P.P.R. v. Tribunal Superior, 103 D.P.R. 903, 906 (1975).
Puede concederse un injunction en los siguientes casos:

“1. Cuando resultare de la petición que el peticionario tiene derecho al remedio solicitado, y dicho remedio, o parte del mismo, consistiere en impedir la comisión o continuación del acto denunciado, bien por un período de tiempo limitado, o perpetuamente.

2. Cuando de la petición o declaración jurada resultare que la comisión o continuación de algún acto, durante el litigio, habrá de causar pérdidas o daños de consideración o irreparables a alguna de las partes.

3. Cuando, durante el litigio, resultare que una de las partes está cometiendo, o amenaza cometer, o que se dispone a cometer, o a procurar o permitir que se cometa, algún acto de contrario a los derechos de otra de las partes, con respecto al asunto en litigio y tendente a hacer que sea ineficaz la sentencia.

4. Cuando una compensación pecuniaria no habría de proporcionar adecuado remedio.

5. Cuando fuere sumamente difícil precisar la cuantía de la compensación que habría de proporcionar remedio adecuado.

6. Cuando la restricción fuere necesaria para impedir una multiplicidad de procedimientos judiciales.

7. Cuando la obligación naciere de un fideicomiso. Artículo 677 del Código de Enjuiciamiento Civil, 32 L. P.R.A. § 3523.”

Según expresó este foro en Sentencia de 23 de enero de 2002, Centro de Recaudación de Impuestos Municipales v. Entec Corporation, et al (KLAN-01-01282), 2002 DTA 581; panel integrado por su Presidenta, Jueza Jeannette Ramos Buonomo, y los Jueces Antonio J. Negroni Cintrón y Pierre E. Vivoni (Juez Negroni Cintrón, Ponente):

*974
“Aunque comúnmente hablemos del recurso extraordinario de injunction, en .realidad se trata de tres recursos diferentes: el entredicho provisional, el injunction preliminar y el permanente. El primero posee una naturaleza más extraordinaria, pues la premura de la ocurrencia de un daño irreparable o la continuación del existente puede dar pie a que el mandamiento judicial sea expedido sin necesidad de que el tribunal oiga a la otra parte... El injunction preliminar es el más utilizado. Este puede ser emitido en cualquier momento del pleito y lo caracteriza la pronta celebración de una vista donde las partes argumentan en tomo a la procedencia del recurso. Se emite con el propósito de mantener el status' quo entre las partes hasta que se celebre el juicio en su fondo para de esa manera evitar que la conducta de la parte demandada convierta en académica la sentencia que posteriormente se dicte o que se le ocasionen daños en consideración al peticionario durante el transcurso del caso. [...] El tercer y último recurso es el injunction permanente, el cual es atendido por el tribunal siguiendo los trámites de un juicio ordinario”.

Así pues, nuestro más alto foro ha establecido los siguientes criterios, como aquéllos. que deben considerarse al hacerse la determinación si procede la concesión de un injunction preliminar:

“1. la naturaleza de los daños que pueden ocasionárseles a las partes de concederse o denegarse el injunction;

2. su irreparabilidad o la existencia de un remedio adecuado en ley;

3. la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo;

4. la probabilidad de que la causa se torne en académica de no concederse el injunction; y

5. el impacto sobre el interés público del remedio que se solicita. ”

Véase, Municipio de Loíza v. Sucesiones de Marcial Suárez y de Encarnación Fuentes, Op. de 11 de junio de 2001, 2001 J.T.S. 87, pág. 1377; Misión Industrial P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 680 (1997); Municipio de Ponce v. Gobernador, 136 D.P.R. 776, 784 (1994).
No obstante estos factores haber sido establecidos para la determinación de si procede o no un injunction preliminar, nuestro Tribunal Supremo ha indicado que “el injunction permanente también requiere la celebración de vista y la consideración de la mayor parte de estos criterios”. Municipio de Loíza v. Sucesiones de Marcial Suárez y de Encarnación Fuentes, supra, págs. 1377-1378. Precisándose el conceder una petición de injunction permanente, si la parte que lo solicita demuestra que: (1) no tiene ningún otro remedio en ley para evitar un daño...; (2) para evitar daños irreparables, o (3) una multiplicidad de procedimientos. Siendo estos criterios un aspecto de la regla básica de que procede un injunction cuando el remedio existente en el curso ordinario de la ley es inadecuado. Id.
Con respecto al aspecto de los “daños irreparables” según el Ledo. David Rivé Rivera, “[e]l elemento decisivo es el de si una compensación monetaria constituiría un remedio tan completo, rápido y adecuado como el remedio de injunction para vindicar los derechos del demandante”. David Rivé Rivera, Recursos Extraordinarios, 2da Edición Revisada, Programa de Educación Jurídica Continua, Facultad de Derecho Universidad Interamericana de P.R., San Juan, 1996, pág. 29.
Por lo tanto, nos corresponde determinar antes de entrar a considerar los errores alegados por el Dr. Huertas, ¿si erró el TPI al determinar sumariamente que no procedía conceder el injunction solicitado, por carecer éste de una reclamación que justificara la concesión de un remedio? A nuestro juicio, procede confirmar la sentencia apelada, toda vez que a pesar de que el vehículo procesal adecuado para que el Dr. Huertas fuera *975 reintegrado en su empleo, lo era el injunction, éste no demostró tener derecho al remedio solicitado. Veamos.
Surge de los hechos estipulados por las partes que el Dr. Huertas no tiene relación contractual con ARC y que no recibe honorarios por parte del Hospital Dr. Susoni, Inc., ni de ARC. Por lo cual, debemos concluir que el Dr. Huertas era un empleado o contratista independiente del Dr. Rodríguez Gómez. Siendo ello así, su permanencia en el Hospital, y posibilidad de prestar sus servicios de anestesiología, dependía totalmente del contrato existente entre Rodríguez Gómez y ARC. Al concluir dicha relación contractual, cesaba a su vez la posibilidad de que el Dr. Huertas administrara anestesia en el Hospital Dr. Susoni, a no ser que fuera directamente contratado por ARC.
Por otra parte, la concesión de los privilegios al Dr. Huertas, por el Hospital Dr. Susoni, representa sólo un requisito que el Dr. Huertas debía cumplir para que pudiera ejercer sus funciones de médico en la referida institución hospitalaria, sin que ello implique que entre el Hospital y el Dr. Huertas existiera una relación contractual.
En consecuencia, los errores primero, segundo y cuarto no fueron cometidos.
Así pues, sólo nos resta discutir si erró el TPI al no determinar que los apelados utilizaron el nombramiento del Dr. Julio Rodríguez Gómez, como Director Regional del Departamento de Salud para la Región Norte de P. R., para enriquecerse injustamente a costa y en menoscabo de los derechos del apelante. A nuestro juicio este error tampoco fue cometido. Veamos.
Dispone en lo pertinente el Artículo 3.3 de la Ley de Etica Gubernamental, Ley Número 12 de 24 de julio de 1985, según enmendada, 3 L.P.R.A. see. 1823, lo siguiente:

“(a)...

(b) Ningún funcionario o empleado publico aceptará un empleo o mantendrá relaciones contractuales de negocio, con una persona, negocio o entidad que esté reglamentada por o que haga negocios con la agencia gubernamental para la cual él trabaja cuando el funcionario o empleado público participe en las decisiones institucionales de la agencia o tenga facultad para decidir o influenciar las actuaciones oficiales de la agencia que tengan relación con dicha persona, negocio o entidad.

[[Image here]]
A nuestro juicio, la posición de Director Regional del Departamento de Salud para la Región Norte de P.R., que ocupó el Dr. Rodríguez Gómez, impedía que éste continuara realizando labores como médico anestesiólogo, por sí o a través de sus representantes, en instituciones hospitalarias con las que el Departamento de Salud sostiene o podría sostener relaciones contractuales, creando de esa forma a todas luces un claro conflicto de intereses. Al así decidir, no estamos atacando la integridad ética del Dr. Rodríguez Gómez, sino que entendemos, es la mejor forma de evitar la más mínima apariencia de conducta impropia.
En mérito a lo expuesto, confirmamos la Sentencia emitida el 30 de abril de 2002, por el Tribunal de Primera Instancia, Sala Superior de Arecibo. En consecuencia, a la solicitud de desestimación de los apelados, se provee No Ha Lugar.
Lo acordó el Tribunal y lo certifica la señora Secretaria General.
Aida Heana Oquendo Graulau Secretaria General
*976 ESCOLIOS 2003 DTA 47
1. La Moción Conjunta en Torno a Evidencia Documental y Hechos Estipulados por las Partes-, tiene fecha de 19 de marzo de 2002.
2. Véase nota 1.
3. No obstante, las sentencias y resoluciones de este Foro no constituir precedente, la citamos por su efecto ilustrativo.
4. A pesar de que según alega el Dr. Huertas, la Moción Conjunta en Tomo a Evidencia Documental y Hechos Estipulados por las Partes que fuera presentada al TPI, se trataba de un borrador de las estipulaciones, las enmiendas realizadas por éste no hubieran ocasionado un resultado distinto.